UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

DIANE S. STEVENSON,

                Plaintiff,

      v.

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

                Defendant.

Case No. 3:11-cv-01485 -ST

OPINION AND ORDER

STEWART, Magistrate Judge:

## INTRODUCTION

Plaintiff, Diane S. Stevenson ("Stevenson"), seeks judicial review of the final decision by the Social Security Commissioner ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("SSA"), 42 USC §§ 401-33.  This court has jurisdiction to review the Commissioner's decision pursuant to 42 USC § 405(g) and § 1383(c)(3). For the reasons set forth below, that decision is REVERSED and REMANDED for further proceedings.

## ADMINISTRATIVE HISTORY

Stevenson protectively filed for DIB on November 15, 2006, alleging a disability onset date of January 1, 2004, later amending her alleged onset date to June 30, 2002, which

is her date last insured.  Tr. 17, 19, 43, 158-60, 175-76, 230.[1]  Her application was denied

initially and on reconsideration.  Tr. 84-88, 92-94.  On October 28, 2009, a hearing was

held before Administrative Law Judge ("ALJ") Richard Say.  Tr. 28-38.  Because Stevenson

did not attend, the ALJ took testimony only from a vocational expert.  *Id*.  On November 24,

2009, the ALJ issued a decision dismissing Stevenson's request for a hearing, leaving the

June 21, 2007 denial in effect.  Tr. 73-76.  On May 21, 2010, the Appeals Council granted

Stevenson's request to reconsider and remanded the matter to the ALJ for a hearing.  Tr. 77-

80.  On October 21, 2010, a second hearing was held before the same ALJ.  Tr. 39-70.  The

ALJ issued a decision on November 8, 2010, finding Stevenson not disabled.  Tr. 17-22.

The Appeals Council denied a request for review on October 21, 2011.  Tr. 1-4.  Therefore,

the ALJ's decision is the Commissioner's final decision subject to review by this court.

20 CFR §§ 404.981, 416.1481, 422.210.

## BACKGROUND

Born in December 1959, Stevenson was 50 years old at the time of the second

hearing before the ALJ.  Tr. 43, 158.  She has an eleventh-grade education and no past

relevant work experience.  Tr. 19-20, 43, 68, 222.  Stevenson alleges that she is unable to

work due to the combined impairments of manic depression, anxiety, and pain.  Tr. 216,

234.

## I.    Medical Records

### A.    Before June 30, 2002 (Date Last Insured)

The medical record before June 30, 2002, is sparse.  On March 31, 2001, Stevenson

was treated for a fracture in her foot.  Tr. 283, 286-87.  On February 21, 2002, she had a

---

[1]  Citations are to the page(s) indicated in the official transcript of the record filed on May 7, 2012 (docket # 12).

negative pap smear.  Tr. 282.  However, as summarized below, later notations in the medical record reveal that she apparently suffered from various physical and mental impairments for years, including drug and alcohol use, hearing loss, and depression.

### B.    After June 30, 2002

On August 19, 2002, at the request of an unknown counselor, Stevenson was referred to Cascadia Behavioral Health Care ("Cascadia") for a mental health evaluation in order to help her stay clean.  Tr. 272-76.  Stevenson presented as quiet, shy, depressed, and suffering from social anxiety.  Tr. 272.  Her treatment history included the following notations: (1) "Hooper – 7/22/02 – 3/2/02 Project Network;" (2) "detox in Kitsap Co.;" (3) "Thunderbird supposed to be rehab, but only detox ('they did nothing for me');" (4) "CCMH – mental health assessment;" and (5) "415102-success."  Id.  Stevenson reported various physical problems, including Hepatitis C, back pain, a broken ankle, breathing problems, and "extensive hearing loss."  Tr. 273.  Her risk behaviors included aggression and a background of domestic violence, including being in an abusive relationship for at least 10 years.  Id.  She reported using crack cocaine on a daily basis, drinking alcohol to "mellow" the crack cocaine, and smoking half a pack of cigarettes a day. Tr. 274.  She reported that she had been clean for 60-70 days, with her most recent relapse occurring on April 3, 2002.  Id.  Stevenson expressed interest in working toward her GED and noted that her hobbies included bowling, reading the Bible, listening to music, cooking, and watching movies.  Id.

The next treatment record from Cascadia is dated October 30, 2002, and indicates that Stevenson was last contacted on August 28, 2002, and was discharged for

noncompliance with rules and regulations.  Tr. 271.  Her discharge level of functioning was a GAF score of 50.  *Id*.

On August 20, 2002, Stevenson's hearing was evaluated by an audiologist who recommended a hearing aid.  Tr. 376, 378.   Stevenson received her hearing aid on November 13, 2002.  Tr. 371-75.

On June 4, 2004, Stevenson obtained treatment at an emergency room for neck pain and a mild headache after being involved in a car accident the previous day.  Tr. 297-312, 348-49.  At that time, Stevenson reported that she was currently taking an albuterol MDI as needed, had a history of acute bronchitis, and was hard of hearing.  Tr. 302, 348.  On October 8, 2004, Stevenson obtained treatment for a foot sprain.  Tr. 277-81, 284-85.

On February 24, 2005, when Stevenson sought treatment for a viral infection, she reported a history of depression for which she was taking Zoloft.  Tr. 288-96, 346-47.

On March 15, 2007, Dorothy Anderson, Ph.D., a consulting psychologist, completed a Psychiatric Review Technique form.  Tr. 313-25.  She summarized the limited medical evidence and concluded that it was insufficient to make a medical disposition regarding Stevenson's disability claim for the period January 31 to June 30, 2002.  Tr. 325.  On March 30, 2007, Mary H. Shwetz, M.D., a consulting physician, agreed with Anderson's assessment and noted that the case file was "inadequately documented."  Tr. 331-33.

On June 19, 2007, Robert Henry, Ph.D., another consulting psychologist, also noted "a lack of evidence prior to DLI of 6/02 to adjudicate this case."  Tr. 341.  He reported that Stevenson alleged hearing voices, being generally paranoid and frightened, and thinking the police were after her.  *Id*.  He cited the August 2002 treatment record at Cascadia,

acknowledging that Stevenson had a history of drug use which "may or may not have been the reason for stopping work, there is no way of knowing." *Id*.

On July 12, 2007, Stevenson presented at an emergency room for dyspnea and anxiety because she was "upset about all that is going on in the world" and worried that someone wanted to hurt her. Tr. 363. She reported chronic pain all over her body for the past two years and denied hearing voices or feeling suicidal. *Id*. After labs, x-rays, an EKG, and a period of monitoring, Stevenson stopped crying, began "sobering up," seemed "much calmer," and was released to her daughter in stable condition. Tr. 365-66.

On January 8, 2010, after the first ALJ denied DIB, Stevenson was evaluated at the Multnomah County Health Department's Westside Primary Care Clinic ("Westside Clinic"). Tr. 402-05. She reported a history of severe physical abuse by a past partner, chronic pain, recent weight loss, and a history of Hepatitis C, bipolar disease, cigarette smoking, and drug and alcohol use. Tr. 403. Stevenson stated that she mostly stayed at home to avoid being around people, had no regular medical care since 2006, had been off all medications since 2007, had previously been hospitalized for psychiatric care, had a history of crack cocaine use, but had been clean for three years. *Id*. After his examination, Amit Shah, M.D., noted that she had not been "seen regularly for health care" since 2002. Tr. 403. Stevenson reported difficulty breathing for approximately two years, frequent exhaustion, neck pain, hand pain, "itchy" fingers, difficulty sleeping or eating, and possible bronchitis. *Id*. She reported that she had previously been diagnosed with bipolar disorder and depression and had taken Seroquel and Effexor which helped, but she was no longer taking any medication. Tr. 403-04. Dr. Shah assessed Stevenson as suffering from shortness of breath, acute bronchitis, alcohol abuse, bipolar disorder, and depression. Tr. 404-05.

At a follow-up appointment on January 15, 2010, Robert Henriques, M.D., noted that Stevenson complained of depression and fatigue, was having difficulty sleeping at night out of fear of attack, had a history of hospitalizations for suicidal ideation and panic attacks in the 1980s, had last attempted suicide some years ago, but was not currently hearing voices or receiving special messages. Tr. 400. Stevenson acknowledged having a problem with alcohol but reported not being able to stop due to her depression. *Id*. Dr. Henriques recommended that Stevenson finish taking antibiotics for her lingering shortness of breath, prescribed Vitamin D, Citalopram, Quetiapine, Lorazepam, and recommended that she begin attending Alcoholics Anonymous meetings to assist her in abstaining from alcohol use. Tr. 401-02.

On January 28, 2010, Jamie M. Lee, LCSW, reported that Stevenson has a long history of trauma, was experiencing suicidal thoughts with no plan as well as homicidal thoughts toward her abuser who she was supposed to see the following day, making note that Stevenson has access to her mother's machete. Tr. 399. Lee and Stevenson decided on a plan to avoid contact with her abuser. *Id*. Lee observed that Stevenson's judgment was impulsive and impaired due to "untreated mental health" issues, but she presented as clear and organized, clean, polite, and easy to engage. Tr. 400. That same day Stevenson was also seen by Susan Marie, a psychiatric mental health nurse practitioner ("PMHNP"), who assessed Stevenson's psychosis as likely connected to PTSD, possible bipolar disorder, and OCD. Tr. 398-99. Marie prescribed Zyprexa and Stevenson agreed to begin alcohol treatment and to refrain from harming herself or others. Tr. 399.

Stevenson was next seen by social worker Lee and PMHNP Marie on February 5, 2010, when she reported doing much better, was able to sleep, and was not experiencing any

homicidal or suicidal thoughts, but was still feeling impulsive and having difficulty concentrating.  Tr. 397.  Marie observed that the "acute crisis" was resolved and continued the Zyprexa for two more weeks.  *Id.*

On February 19, 2010, when Stevenson was evaluated by Dr. Henriques for COPD, she appeared alert, in no apparent distress, cooperative, and healthy.  Tr. 396.  Stevenson reported that she was still using alcohol but the voices in her head were better with the medication.  *Id.*

On March 25, 2010, Stevenson told Dr. Henriques that she had to quit her temp job because "they were yelling at me," recently had to sleep with her abuser, and had since been bedridden and using alcohol due to depression.  Tr. 394-95.  Although the medication was helping, she ran out and was unable to get refills.  Tr. 395.  Dr. Henriques prescribed Citalopram, Hydroxyzine, and Vitamin D, advised Stevenson to reduce or avoid alcohol and referred her for counseling and social service needs.  *Id.*  Before seeing Dr. Henriques, Stevenson approached social worker Lee with teary, bloodshot eyes and asked for help processing her feelings about her recent contact with her abuser.  *Id.*  She agreed to return after her appointment with Dr. Henriques, but after waiting for Lee to finish up with another client, she left without communicating with the staff.  *Id.*  Lee tried to call her to assess risk and provide support, but was not able to reach her.  *Id.*

On April 2, 2010, Stevenson met with Diana Barnard, a case manager at the Westside Clinic, to discuss her application for disability benefits.  Tr. 380.  Stevenson noted that she had filed several disability applications, had been represented by an attorney, but that her attorney expected her to "do too much to prepare her case," and she missed her hearing because she did not have the paperwork ready.  *Id.*  Stevenson had tried to work the

previous month at a job through a temp service, but only lasted two and half days because her employer yelled at her which triggered memories of her abuser. *Id*. Stevenson reported experiencing severe pain in her shoulders, visual hallucinations, fear of other people and their possible violence against her, inpatient psychiatric hospitalization in 1979, and a long history of physical abuse, including being stomped on and hit in the head, an assault in 2000 that resulted in a concussion with soft tissue brain injury, and a suicide attempt in 2007 that resulted in a police response but no hospitalization. *Id*. Barnard concluded that Stevenson needed "more intense focus and assistance" than she was able to provide at that time and referred her to Kascadare Causeya, Program Manager at Central City Concern's "BEST Program." *Id*.

On May 18, 2010, Dr. Henriques assessed Stevenson's bipolar affective disorder, depression, suicidal ideation, COPD, alcohol dependence, and PTSD. Tr. 358. He observed that Stevenson was cooperative, crying, and in mild distress. *Id*. Her speech was normal, her affect depressed, and she expressed delusional thinking and psychotic ideation. *Id*. Stevenson expressed that she had been feeling suicidal and had recently taken a friend's hydrocodone pill and combined it with alcohol because she hoped not to wake up. *Id*. She had not been taking her medication daily because she wanted to "stretch them out," was not sure what medication she was taking, and she admitted to being confused a lot and hearing voices. *Id*. Dr. Henriques prescribed Stevenson with Citalopram, Hydroxyzine, and Quetiapine. *Id*.

On May 21, 2010, Stevenson reported to social worker Lee feeling better now that she was taking her medications again. Tr. 357-58. Lee made arrangements to fill her medications at a pharmacy closer to her home, discussed her recent distress over sleeping

with her abuser "to get [her] bills paid," and discussed her difficulty following through with the disability benefits process.  Tr. 358.   Lee assessed Stevenson as "coping marginally." *Id*.  Stevenson the met with her case manager who put her in touch with Causeya at Central City Concern who reassured Stevenson that he would come and pick her up for her next appointment.  Tr. 357.

On May 27, 2010, Dr. Henriques observed that though Stevenson appeared depressed and reported hearing voices and being afraid to leave her apartment, her speech was normal with no delusional thinking or psychotic ideation.  Tr. 356-57.

On June 24, 2010, at the request of the BEST Program, Steven P. Barry, Ph.D., conducted a psychological evaluation which included a clinical interview, personality assessment inventory, and a review of the file information provided by BEST.  Tr. 413-18. After an extensive recitation of Stevenson's history, Dr. Barry diagnosed Stevenson with PTSD, alcohol abuse, major depressive disorder (recurrent, severe), assessed a GAF of 33-35, and concluded as follows:

> I think she is disabled due to combination of PTSD and depression.  I don't think she is a personality disordered woman, but she does demonstrate behaviors and beliefs that are Axis II related (hyper-dependency, no emotional control or regulation, very little stress tolerance).  She cannot manage the basics of her life and I cannot see how she could manage what would be necessary to look for, apply for, and keep employment.  Her history is, though she may obtain some kind of work, she doesn't last; she stops going to work, becoming so agitated and fearful when she goes to a job, that she stops going and/or walks off the job.

Tr. 417-18.

On September 27, 2010, prior to the second hearing at the request of Stevenson's attorney, Dr. Henriques completed a Mental Impairment Questionnaire designed to assess Stevenson's mental condition on or before June 30, 2002.  Tr. 423-30.  He diagnosed

Stevenson with bipolar affective disorder and assigned a current GAF of 48, noting that during the past year, her typical GAF was 38 and lowest GAF was 25. Tr. 423. Clinically, Stevenson presented with suicidal ideation and psychotic delusions, and although Seroquel and Citalopram controlled most of her severe symptoms, she is "still not functional above mid-40's GAF." Tr. 425. Dr. Henrique assessed that Stevenson's ability to do work-related activities would be "markedly limited" in every area listed as part of the "mental abilities and aptitudes needed to do unskilled work." Tr. 428-29. He noted that Stevenson had marked restriction in activities of daily living and maintaining social functioning, frequent deficiencies in concentration, persistence, and pace, and continual episodes of deterioration in work or work-like settings which cause her to withdraw from that situation or to experience exacerbation of signs and symptoms. Tr. 429. Dr. Henrique opined that Stevenson has been unable to work since January 1, 2008.[2] *Id.*

On October 1, 2010, PMHNP Marie wrote a letter stating that Stevenson had been diagnosed with severe PTSD, obsessive compulsive disorder, and major depressive disorder. Tr. 420. She further explained that Stevenson sometimes experiences psychotic symptoms that prevent her from leaving her room and from performing critical activities of daily living such as obtaining food and riding public transportation. *Id.* PMHNP Marie provided a detailed discussion of Stevenson's symptoms of each of her disorders, the barriers to successful treatment, and the impact on her ability to carry out the activities of daily living, ultimately concluding that she did not believe that Stevenson was "capable of any work at this time, and will be so impaired for well over a year." Tr. 420-21. She reiterated this opinion on October 20, 2010. Tr. 431.

---

[2] The year is hard to read, and might instead say January 1, 2003.

II.    **Stevenson's Testimony**

    A.    **Written Testimony**

Stevenson completed a Work Activity Report on December 13, 2006, which included information about work performed since January 1, 2004. Tr. 207-14. Stevenson wrote that she had worked for a few days in April and September 2006 at two temporary agencies doing "production work." Tr. 208. She also worked for two weeks doing laundry for a hospitality company but quit because of back pain and because someone yelled at her. Tr. 209. At each job, she had help getting ready for work, had special transportation to and from work, and was given different, fewer, or easier duties. Tr. 212.

On January 8, 2007, Stevenson completed a Disability Report. Tr. 215-224. She reported that her illnesses first began to bother her in 1988 and she first became unable to work in 1989. Tr. 216. She claimed an inability to work because she calls in sick due to feeling tired and not wanting to see or talk to anyone, not even family. Tr. 216-17. Her longest job consisted of putting things into plastic bags and required her to walk, stand, sit, stoop, kneel, crouch, and reach, but did not require her to write or complete reports or to use machines, tools, equipment, technical knowledge, or skills. Tr. 217. As medical history, Stevenson listed that sometime between 1979 and 1981 she was admitted to the "Providence mental ward" because she "flipped out on somebody," but did not otherwise know the details of when she was admitted, why, or even where. Tr. 219. In December 2000, she was admitted to Emanuel Hospital due to a severe concussion and broken ribs as the result of an attack. Tr. 220. In 2001, she went to the Good Samaritan Clinic because she had tried to kill herself and to Cascadia for a psychological evaluation. Tr. 218. Stevenson reported that she was currently taking Seroquel, Effexor, and "some other" medications she could not

remember.  Tr. 221.  She further noted that she was crying, having trouble focusing, and overall feeling frustrated about filling out the paperwork.  Tr. 223.

On April 13, 2007, as part of her appeal from her initial denial of benefits, Stevenson completed another Disability Report.  Tr. 242-49.  She wrote that beginning in February 2007, her shoulders, neck, and hand started hurting more and she also started locking herself in the bedroom at night and was not sleeping because she thinks someone is in her hallway and bathroom at night.  Tr. 242-43.  Stevenson also reported that she thought that the police had come to her house for an "intervention" on March 22, 2007, because she was threatening to kill herself.  Tr. 242.  She had not worked since she last filled out the report, was no longer on medication, and did not report any additional medical history.  Tr. 243-46. She noted that she no longer cared about her appearance or hygiene because it was too much for her to get out of bed or have company, so she prefers to stay in her locked bedroom where she feels safe.  Tr. 246.  Stevenson wrote lengthy additional remarks centering on her frustration with the disability benefits process, her confusion, fear, anger, and desire for help.  Tr. 248.

On May 22, 2007, on a form provided by her attorney, Stevenson noted that she had headaches at least once a month for the previous seven years, which generally manifest as a throbbing pain ("8" out of "10").  Tr. 335.  At that time, she was only taking Tylenol to relieve her headaches, noting that she did not have a doctor.  Tr. 336.

Three days later, on May 25, 2007, Stevenson filled out two more forms provided by her attorney, rating how she felt on "good days" versus "bad days."  Tr. 337-40.  On "good" days, Stevenson reported "extreme" difficulty with seven out of 20 areas:  maintaining attention and concentration for extended periods, performing activities within a regular

schedule, maintaining regular attendance and punctuality within customary tolerances,

completing a normal workday and workweek without interruptions from psychologically

based symptoms, performing at a consistent pace without an unreasonable number and

length of rest periods, interacting appropriately with the general public, accepting

instructions and responding appropriately to criticism from supervisors, traveling to

unfamiliar places, using public transportation, and setting realistic goals or making plans

independently of others.  Tr. 337-38.  She reported "moderate" or "marked" difficulty in the

other 13 assessment areas.  *Id*.  On "bad" days, Stevenson reported "extreme" difficulty in

17 areas.  She reported "marked" difficulty in the other three areas: the ability to sustain an

ordinary routine without special supervision, the ability to get along with coworkers without

distracting them or exhibiting behavioral extremes, and being aware of normal hazards and

taking appropriate precautions.  Tr. 339-40.

### B.    Hearing Testimony

At her October 21, 2010, hearing Stevenson testified that she lives alone, does not

know how to write notes or letters, cannot read for more than a couple of minutes, and

cannot make change.  Tr. 44, 48.   She can only focus on reading for a couple of minutes at

a time because "there's something else going on in here" and on other tasks for about five

minutes at a time.  Tr. 48-49.  She wears hearing aids in both ears.  Tr. 48.

After her mother died in 2008, Stevenson stopped cleaning her house because she

does not "have the strength."  Tr. 46.  When she tries to do the dishes, she usually has to

take frequent breaks, but gets so tired that she does not "even think about finishing."  Tr. 49.

Once or twice a month, her daughter will bring her groceries.  Tr. 49-50.  Despite the

infrequent delivery of food, Stevenson does not each much.  Tr. 50.   She sleeps about four

hours a night, takes short naps throughout the day, and although she feels tired when she

wakes up at night, she cannot go back to sleep.  Tr. 47-48.  She frequently experiences

sleepless nights because she is "worried," sees footprints by her window, checks her

windows and doors throughout the night, and sleeps with a machete to protect herself from

"whatever's [*sic*] out there."  Tr. 52-53.  She has no friends, sees her brother once every

month or two, and sees her daughter and her daughter's family once a week, sometimes

attending church with them.  Tr. 50-51.

Over the years, Stevenson has tried working at various temp agencies, but some days

she "just didn't want to go to work" and "didn't know what was wrong" because she had not

seen a doctor and did not have any medication.  Tr. 53.  Sometime in 2010, at the request of

her doctor, she began seeing a social worker every two weeks.  Tr. 54.  Stevenson expressed

difficulty with anger issues, did not think she could get up every day and go to a full-time

job because she has trouble breathing, has pain in her legs and back, and is "just weak,"

with little strength or energy.  Tr. 55.  When asked what she would do if she was at work

and did not understand how to complete a task, she responded that she would "get up and go

home."  *Id*.

At the time of the hearing, Stevenson testified that though she previously struggled

with alcohol and drug abuse, last drank alcohol about four months earlier, and last took

someone else's prescription drugs about five months earlier.  Tr. 58-61.

## III.    <u>Lay Testimony</u>

Causeya, who had worked with Stevenson through the Central City Concern's BEST

Program to file for disability benefits, testified at the hearing.  Tr. 61-66.  Causeya noted

that Stevenson was not reliable enough to follow through on tasks and responsibilities,

becomes easily frustrated and overwhelmed, and withdraws "when something challenges her understanding." *Id*. He opined that Stevenson would not be able to be relied on to come to show up at a job on time five days a week. Tr. 63.

## IV. **Vocational Expert Testimony**

At the first hearing on October 28, 2009, which Stevenson did not attend, the ALJ took testimony Gary Jesky, a vocational expert. Tr. 33-37. Jesky characterized Stevenson's work history as including "some involvement in production work," which he classified as a production assembler, which would be light, unskilled work, with an SVP rating of two. Tr. 34. The ALJ asked Jesky whether the following individual could perform Stevenson's past work as a production assembler: is 49 years old, has an eleventh grade education and not much of a work history, has a past foot fracture, has a "fairly low level" of reading, writing and arithmetic skills, is limited to light exertion level activities, must avoid a noisy environment, and should have only superficial interaction with the general public and coworkers. Tr. 34-35. Jesky responded affirmatively. Tr. 35-36.

At the second hearing on October 21, 2010, the ALJ took testimony from another vocational expert, Frederick Cutler. Tr. 67-69. Cutler noted that Stevenson's work history consisted of unskilled, light work, "some of it perhaps even at a sheltered level," and that he was "not sure there is any SGA-level work." Tr. 67-68. The ALJ asked Cutler what jobs the following individual could perform: 50 years old, an eleventh grade education, no past relevant work, limited to light work, only limited ability to read and no ability to write, perform arithmetic, or use numbers, with Stevenson's "mental limitations, based on the testimony." Tr. 68-69. Cutler responded that such an individual could perform no jobs because "the testimony is that the person would not be reliable in terms of getting to work

or performing work on a consistent basis, would have difficulty dealing with any type of stress, [and] does not like to, or would not work well with the general public."  Tr. 69.

## DISABILITY ANALYSIS

A claimant seeking DIB under Title II must establish disability on or prior to the date last insured.  42 USC § 416(i)(3); *Burch v. Barnhart*, 400 F3d 676, 679 (9th Cir 2005).  In addition, the claimant has the burden to prove that her condition was "continuously disabling from the date of onset during insured status to the time of application for benefits."  *Flaten v. Sec'y of Health & Human Servs.*, 44 F3d 1453, 1460 (9th Cir 1995).

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 USC § 423(d)(1)(A).  The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act.  20 CFR § 404.1520; *Tackett v. Apfel*, 180 F3d 1094, 1098-99 (9th Cir 1999).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.  If so, the claimant is not disabled.  20 CFR § 404.1520(a)(4)(i) & (b).

At step two, the ALJ determines if the claimant has "a severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR § 404.1520(a)(4)(ii) & (c).  Absent a severe impairment, the claimant is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment meets or equals an impairment "listed" in the regulations.  20 CFR § 404.1520(a)(4)(iii) & (d); 20 CFR Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If the impairment is determined to meet or equal a listed impairment, then the claimant is disabled.

If adjudication proceeds beyond step three, the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite the limitations imposed by his or her impairments. 20 CFR § 404.1520(e); Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 (July 2, 1996).

At step four, the ALJ uses the RFC to determine if the claimant can perform past relevant work. 20 CFR § 404.1520(a)(4)(iv) & (e). If the claimant cannot perform past relevant work, then at step five, the ALJ must determine if the claimant can perform other work in the national economy. *Bowen v. Yuckert*, 482 US 137, 142 (1987); *Tackett*, 180 F3d at 1099; 20 CFR § 404.1520(a)(4)(v) & (g).

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F3d at 1098. If the process reaches step five, the burden shifts to the Commissioner to show that jobs exist in the national economy within the claimant's RFC. *Id*. If the Commissioner meets this burden, then the claimant is not disabled. 20 CFR § 404.1520(a)(4)(v) & (g).

## <u>ALJ'S FINDINGS</u>

At step one, the ALJ concluded that Stevenson has not engaged in substantial gainful activity at any relevant time. Tr. 19-20. In particular, the ALJ concluded that beginning in 1975, Stevenson had no earnings that reach the level of substantial gainful activity. Tr. 20.

At step two, the ALJ determined that no medical signs or laboratory findings substantiated the existence of a severe medically determinable impairment prior to June 20, 2002, Stevenson's date last insured. Tr. 20-21.

Accordingly, the ALJ determined that Stevenson was not disabled at any time through June 30, 2002. Tr. 21-22.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 USC § 405(g); *Lewis v. Astrue*, 498 F3d 909, 911 (9th Cir 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F3d 1028, 1035 (9th Cir 2007), citing *Reddick v. Chater*, 157 F3d 715, 720 (9th Cir 1998). The reviewing court may not substitute its judgment for that of the Commissioner. *Ryan v. Comm'r of Soc. Sec. Admin.*, 528 F3d 1194, 1205 (9th Cir 2008), citing *Parra v. Astrue*, 481 F3d 742, 746 (9th Cir 2007); *see also Edlund v. Massanari*, 253 F3d 1152, 1156 (9th Cir 2001). Where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "'supported by inferences reasonably drawn from the record.'" *Tommasetti v. Astrue*, 533 F3d 1035, 1038 (9th Cir 2008), quoting *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F3d 1190, 1193 (9th Cir 2004); *see also Lingenfelter*, 504 F3d at 1035.

## DISCUSSION

To be entitled to DIB, Stevenson has the burden to prove she was disabled on or before June 30, 2002, her date last insured, through the date she filed her application, November 15, 2006. The ALJ ended his analysis at step two of the sequential disability process because no medical signs or laboratory findings substantiated the existence of a severe medically determinable impairment on June 30, 2002. Stevenson contends that the

ALJ erred by failing to properly analyze her mental and physical limitations and to fully and fairly develop the record during the relevant time period.

## I.      Step Two Determination

### A.      Legal Standard

At step two, Stevenson was required to prove that she suffered from at least one "severe medically determinable physical or mental impairment" that meets the 12-month durational requirement.  20 CFR § 404.1520(a)(4)(ii) & (c).  A severe impairment is one that significantly limits the claimant's physical or mental ability to do basic work activities.  20 CFR § 404.1520(c).  "Basic work activities" are the abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, *etc.*  20 CFR § 404.1521(b).  The Commissioner has explained that "an impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities."  SSR 96-3p, 1996 WL 374181, at *1 (1996).

The Ninth Circuit has explained that the step two severity determination is expressed "in terms of what is 'not severe.'"  *Smolen v. Chater*, 80 F3d 1273, 1290 (9th Cir 1996). Importantly, "the step-two inquiry is a *de minimis* screening device to dispose of groundless claims."  *Id*, citing *Yuckert*, 482 US at 153-54.  "[T]he severity regulation is to do no more than allow the [Social Security Administration] to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working."  SSR 85-28, 1985 WL 56856, at *2  (1985) (internal quotation omitted).

"An ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when this conclusion is 'clearly established by medical evidence.'"  *Webb v.*

*Barnhart*, 433 F3d 683, 687 (9th Cir 2005), quoting SSR 85-28.  The ALJ is required to consider

the claimant's subjective symptoms, such as pain or fatigue, in determining severity.  *Smolen*, 80

F3d at 1290; 20 CFR § 404.1529.  While the ALJ must take into account a claimant's pain and

other symptoms at step two, the severity determination is made solely on the basis of the medical

evidence in the record.  SSR 85-28, 1985 WL 56856, at *4.  The court's task in reviewing a

denial of benefits at step two is to "determine whether the ALJ had substantial evidence to find

that the medical evidence clearly established that [the claimant] did not have a medically severe

impairment or combination of impairments."  *Webb*, 433 F3d at 687.

The ALJ is responsible for resolving conflicts and ambiguities in medical evidence.  *See*

*Batson*, 359 F3d at 1195 (citation omitted).  Where the medical evidence in the record is not

conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the

ALJ.  *Sample v. Schweiker*, 694 F2d 639, 642 (9th Cir 1982).  In such cases, "the ALJ's

conclusion must be upheld."  *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F3d 595, 601 (9th

Cir 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in

fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of

medical experts "falls within this responsibility."  *Id* at 603.

**B.    Medical Evidence**

**1.    ALJ's Findings**

Despite the scarcity of the records, the ALJ summarized in some detail the medical

evidence that related to Stevenson's limitations prior to June 30, 2002, including the 2001

foot fracture, the 2002 cytopathology report, and a 2007 self-report of headaches for the

past seven years which would have extended into the relevant disability period.  Tr. 20.

With regard to the complaint of headaches, the ALJ noted "no supporting medical records

showing the onset or describing the severity of any such headaches." *Id*.  Though outside the relevant period, the ALJ also noted that Stevenson had been tested for sensoneural hearing loss in August 2002 and ultimately began using a hearing aid in November 2002.  *Id*.  The ALJ also addressed the records from Cascadia because they were "close to the date last insured." *Id*.  They indicated that Stevenson had received "detoxification treatment for alcohol abuse earlier in the year, a significant history of alcohol abuse, and complaints of depression and anxiety or post traumatic stress disorder like symptoms." *Id*.  The ALJ then concluded as follows:

> From these records it is possible to presume that, prior to the date last insured of June 30, 2002, it is likely that the claimant was developing, or had a hearing impairment, that responded to amplification, a condition that would not contribute to reducing residual functional capacity or a finding of disability.  It is possible that she had issues with depression and anxiety, but there is no way to determine severity and no indication of treatment, which would presumably reduce severity of the condition.  It is also probable that the claimant had significant issues with alcohol, as well as a history of extensive substance abuse, which would probably have exacerbated the condition.

Tr. 21.

Although the ALJ noted that the opinions of Dr. Henriques, Dr. Barry and PMHNP Marie "may even be  credible or accurate," he rejected them as being "current" and having "no bearing on [Stevenson's] condition prior to the date last insured." Tr.  *Id*.  He noted that PMHNP Marie had known Stevenson for one year since October 2009, and that Dr. Henrique had been seeing Stevenson for 10 months before concluding that she had been unable to work since January 1, 2008.  *Id*.

Stevenson contends that the ALJ erred by ignoring or rejecting medical evidence from her treating sources and completely omitting mention of her diagnosed back pain, hearing loss, breathing problems, depression, anxiety, OCD, and PTSD.  Specifically,

Stevenson contends that the ALJ erred by failing to consider:  (1) the Cascadia treatment note which estimated that she had a GAF of 50 in late August 2002; (2) Dr. Barry's June 24, 2010 psychological examination; (3) Dr. Henriques's 2010 treatment notes and September 27, 2010 opinion; and (4) PMHNP Marie's 2010 treatment notes and October 1, 2010 opinion.  The Commissioner responds that all of these records are retrospective and do not support that Stevenson was disabled as of June 30, 2002.

## 2.    **Dr. Henriques and Dr. Barry**

Generally, a treating physician's opinion is afforded greater weight than the opinion of an examining physician which is, in turn, is afforded greater weight than the opinion of a non-examining physician.  *Ramirez v. Shalala*, 8 F3d 1449, 1453 (9th Cir 1993) (citations omitted); *Pitzer v. Sullivan*, 908 F2d 502, 506 n4 (9th Cir 1990).  However, a treating physician's uncontroverted opinion on issues that are reserved to the Commissioner is neither controlling nor given any special significance.  20 CFR § 404.1527(e); *see also* SSR 96-5p, 1996 WL 374183 (July 2, 1996).  Whether an individual is "disabled" under the Social Security Act is an issue reserved to the Commissioner.  SSR 96-5P.

An uncontradicted treating or examining doctor's opinion may only be discredited for "clear and convincing reasons."  *Thomas v. Barnhart*, 278 F3d at 947, 957 (9th Cir 2002) (citation omitted).  If contradicted, then the ALJ may reject the treating or examining doctor's opinion by providing "specific and legitimate reasons" supported by substantial evidence in the record.  *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995) (citation omitted).  Since the opinions of Dr. Henriques and Dr. Barry are not contradicted, they may only be discredited for clear and convincing reasons.

The ALJ gave only one reason to reject them, namely that they failed to address Stevenson's condition prior to her date last insured of June 30, 2002.  If a claimant is not disabled on or before the date his or her insured status expires, any subsequent deterioration of a condition is irrelevant.  *Flaten*, 44 F3d at 1461 n.4, citing *Waters v. Gardner*, 452 F2d 855, 858 (9th Cir 1971).  However, medical reports "containing observations made after the period for disability are relevant" to the ALJ's evaluation of conditions present prior to the expiration of a claimant's insured status.  *Smith v. Bowen*, 849 F2d 1222, 1225 (9th Cir 1988).  Just because such reports "are inevitably rendered retrospectively," they "should not be disregarded solely on that basis."  *Id*, citing *Bilby v. Schweiker*, 762 F2d 716, 719 (9th Cir 1985); *Flaten*, 44 F3d at 1461 n5.

> Considerations to be made in whether to give such a report less weight include: whether the report specifically assessed plaintiff's functional capacity prior to the insured's expiration date, whether the medical reports created during the time period at issue made only limited references to limitations in functional capacity; whether intervening circumstances such as a car accident exacerbated the medical condition; and whether the retrospective opinion conflicted with the same physician's earlier opinion.

*Albrecht v. Astrue*, Civil No. 11-873-PHX-MHB, 2012 WL 4361314, at *6 (D Ariz Sept. 25, 2012), citing *Johnson v. Shalala*, 60 F3d 1428, 1432–33 (9th Cir 1995).

The bulk of the treatment record consists of emergency room visits.  Not until Stevenson began treatment at the Westside Clinic in 2010 did she begin receiving regular medical care.  However, scattered throughout the records are references to her mental health struggles, including several references to her inpatient psychiatric hospitalization sometime in the late 1970s or early 1980s (Tr. 219, 400) which is around the same period that the ALJ determined that Stevenson stopped being gainfully employed.  Tr. 20.  Also scattered throughout the record are mentions of Stevenson's struggles with depression, anxiety, and her history of domestic

violence and alcohol and drug abuse.  Tr. 293, 346, 356-58, 363, 365-66, 380, 394-97, 399-400,

403-05.  When concluding that there "was a lack of evidence prior to DLI of 6/02," the

consulting psychologist Henry noted that Stevenson alleged she was hearing voices, was

generally paranoid and frightened, and opined that her history of drug use "may or may not have

been the reason for stopping work."  Tr. 341.

Although just past the date last insured, Cascadia's August 19, 2002 evaluation notes that

Stevenson had gone through several detox programs during 2002, had been evaluated at

"CCMH" for a "mental health assessment," and had been referred to Cascadia at the request of

an unknown counselor.  Tr. 272-76.  These notations indicate that Stevenson was receiving some

kind of treatment for her alcohol and drug abuse and possibly for her mental health issues prior

to her date last insured.  Yet the ALJ mentioned these issues only to say that "it is possible that

she has issues with depression and anxiety . . . significant issues with alcohol, as well as a history

of extensive substance abuse, which would have probably exacerbated the condition."  Tr. 21.

Because the record did not provide any way to determine the severity of these conditions and

there was "no indication of treatment," the ALJ determined that they were not severe

impairments.  *Id*.  The Ninth Circuit has "criticized the use of a lack of treatment to reject mental

complaints both because mental illness is notoriously underreported and because 'it is a

questionable practice to chastise one with a mental impairment for the exercise of poor judgment

in seeking rehabilitation.'"  *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F3d 1294, 1299-

1300 (9th Cir 1999), quoting *Nguyen v. Chater*, 100 F3d 1462, 1465 (9th Cir 1996) (quotation

omitted).   Yet the ALJ cited Stevenson's lack of treatment to reject her allegations of mental

impairments.

With regard to Dr. Henriques's opinion that Stevenson has been disabled since approximately January 1, 2008, this date is handwritten, hard to read, and instead may be read as January 1, 2003, which is just a few months after Stevenson's date last insured.   The ALJ did not acknowledge or seek to clarify this potential discrepancy.   If the date is actually January 1, 2003, then the ALJ could not reject Dr. Henriques's opinion as being irrelevant.

Moreover, even if the ALJ properly questioned the opinions of Dr. Henriques and Dr. Barry because they failed to provide an onset date, the ALJ should have asked for clarification, especially since these opinions are the only treating and examining physician opinions in the record.  Each of the agency's consulting psychologists and physicians failed to render an opinion on whether Stevenson was disabled, instead concluding that there was insufficient evidence from which to form an opinion and adjudicate the case.  *See* Tr. 313-25 (consulting psychologist Anderson), 331-33 (consulting physician Dr. Shwetz), 341 (consulting psychologist Henry).

Given the lack of any contradictory opinion, the fact that the opinions from Stevenson's treating and examining physicians were rendered long after Stevenson's date last insured and did not directly address an onset date for her disability is not the kind of clear and convincing reason required to reject them.

### 2.    PMHNP Marie

Only opinions from an "acceptable medical source" are entitled to controlling weight regarding the existence of a disability.  20 CFR § 404.1513(d).  Acceptable medical sources are licensed physicians, psychologists, optometrists, podiatrists, and qualified speech-language pathologists.  *Id*.  A PMHNP, such as Marie, is not considered an acceptable medical source, unless she works closely with and is supervised by an acceptable medical source.  *Taylor v.*

*Comm'r of Soc. Sec. Admin.*, 659 F3d 1228, 1234 (9th Cir 2011).  Here, the record fails to reveal that PMHNP Marie was working closely with and under the supervision of Dr. Henriques or any other acceptable medical source.

Nevertheless, such an opinion may be used to evaluate the severity of a claimant's impairment and how it affects his or her ability to work.   SSR 06-03p.  In order to reject the testimony, the ALJ must give germane reasons.  *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F3d 1050, 1053 (9th Cir 2006); *Turner v. Comm'r of Soc. Sec.,* 613 F3d 1217, 1224 (9th Cir 2010).  Here, the ALJ failed to give reasons germane to PMHNP Marie, instead rejecting her opinion by lumping it together with Dr. Henriques's and Dr. Barry's opinions and rejecting them all for the same reason, namely that they do not directly address Stevenson's limitations prior to June 30, 2002.  As discussed above, this is not a sufficient reason to reject her opinion.

### 3.    Conclusion

The ALJ himself acknowledged that Stevenson may well have struggled with depression and anxiety prior to June 30, 2002.  Tr. 21.  He also referenced the Cascadia treatment note indicating that Stevenson reported going through a detoxification program for her alcohol abuse earlier that year, which would have been during the relevant period.  *Id.*  Even though the record reveals that Stevenson had struggled with mental health issues prior to her date last insured and up until the present, the ALJ rejected the only opinion evidence in the record simply because it did not directly address her condition prior to her date last insured.  In light of the scarcity of the record during the relevant period and the fact that Stevenson sought disability primarily on account of mental impairments, the ALJ erred by rejecting the opinions by Dr. Henriques, Dr. Barry, and PMHNP Marie for that reason.

Keeping in mind that the step two severity determination is essentially a "*de minimis*
*s*creening device to dispose of groundless claims," *Smolen*, 80 F3d at 1290, the ALJ erred by
concluding that Stevenson did not suffer from any severe impairments.

## II.    <u>Duty to Develop Record</u>

Stevenson also argues that the ALJ failed to satisfy his duty to fully develop the record by
failing to make every reasonable effort to obtain all of her treating providers' medical evidence,
obtain a consultative examination to address whether her limitations affected her ability to work
in 2002, and address the issues raised by her treating sources' opinions that her mental health
conditions have existed for many years.  Specifically, on October 15, 2009, Stevenson's counsel
requested that Stevenson be tested for Listing 12.02 (organic mental disorders) and Listing 12.05
(mental retardation) and that, due to her history of serious head injuries, she also receive a
neuropsychological workup.  Tr. 268.  At the second hearing, Stevenson's counsel argued that
she meets the listings for affective disorder (Listing 12.04), depression (Listing 12.04), and
anxiety (Listing 12.06).  Tr. 42.

"Ambiguous evidence, or the ALJ's own finding that the record is inadequate to
allow for proper evaluation of the evidence, triggers the ALJ's duty to conduct an
appropriate inquiry." *Tonapetyan v. Halter*, 242 F3d 1144, 1150 (9th Cir 2001) (internal
quotation marks and citation omitted).  This duty may require the ALJ to obtain additional
information, for example, by contacting treating physicians, scheduling consultative
examinations, or calling a medical expert.  20 CFR §§ 404.1512(e)-(f), 404.1519a.  A
claimant does not have "an affirmative right to have a consultative examination performed
by a chosen specialist." *Reed v. Massanari*, 270 F3d 838, 842 (9th Cir 2001).  The
Commissioner may, however, order an examination "to try to resolve an inconsistency in

the evidence, or when the evidence as a whole is insufficient to allow us to make a

determination or decision on [the] claim."  20 CFR § 404.1519a(b); *see also* 20 CFR

§§ 404.1517, 404.1527(c)(3).  The court may reverse and remand the Commissioner's final

decision where the court concludes that the ALJ should have ordered a consultative

examination. *See Reed*, 270 F3d at 843-45.

        Not seeing an onset date in either Dr. Barry's or PMHNP Marie's reports and given the

possible confusion over Dr. Henriques's onset date, the ALJ should have, at a minimum,

recontacted them to develop the record further in that regard.  This duty was especially important

since these opinions are the only ones addressing Stevenson's disability.  It is well-established

that if a medical report does not contain all the necessary information or, alternatively, if an ALJ

needs to know the basis of a doctor's opinion, the ALJ has an affirmative duty to conduct an

appropriate inquiry.  *Smolen*, 80 F3d at 1288.   This conclusion is bolstered by the fact that all of

the consulting physicians and psychologists in 2007 noted the absence of sufficient evidence to

rate Stevenson's ability to perform work-related tasks.  Tr. 230, 241, 313-25, 330-33, 341.

        As discussed above, the record is replete with references to Stevenson's longtime

struggle with mental health issues, including a history of hospitalizations prior to June 30, 2002,

as well as her long struggle with alcohol and drug abuse, which as the ALJ himself recognized

"would probably have exacerbated" her issues with depression and anxiety.  Tr. 21.  Although

neither Dr. Henriques, Dr. Barry, nor PMHNP Marie treated Stevenson prior to June 30, 2002,

they may nonetheless be in a position to opine how long her mental impairments have existed

based on their knowledge as to how and when symptoms typically become manifest and develop

over time.  Given the scarcity of the record and the nature of Stevenson's alleged mental

impairments, the record was sufficiently ambiguous to trigger the ALJ's duty to develop it

further by recontacting the treating and examining sources to establish an onset date for Stevenson's mental limitations.

If those sources support an onset date prior to Stevenson's date last insured, then the ALJ must proceed past step two and determine whether Stevenson's mental limitations affected her ability to work, which is typically addressed by a consultative examination. On the other hand, if those sources cannot establish on onset date prior to Stevenson's date last insured, then a consultative examination need not be purchased. 20 CFR § 1519b(c).

## III.    Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F3d 1172, 1178 (9th Cir), *cert denied*, 531 US 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r of the Social Sec. Admin.*, 635 F3d 1135, 1138-39 (9th Cir 2011), quoting *Benecke v. Barnhart*, 379 F3d 587, 593 (9th Cir 2004). "[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Moisa v. Barnhart*, 367 F3d 882, 886 (9th Cir 2004), quoting *INS v. Ventura*, 537 US 12, 16 (2002) (*per curiam*).

Even crediting the opinions of Dr. Henriques, Dr. Barry, and PMHNP Marie as true, it is not clear that the ALJ would be required to award benefits because the record is indeed inadequately developed regarding whether, prior to her date last insured, Stevenson suffered severe mental impairments and if so, the degree of Stevenson's functional limitations from

June 30, 2002 to November 15, 2006.   Accordingly, remand is appropriate to further develop the record to address these deficiencies.

## <u>ORDER</u>

For the reasons discussed above, the Commissioner's decision is REVERSED and REMANDED for further proceedings pursuant to Sentence Four of 42 USC § 405(g).

DATED November 16, 2012.


s/ Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge